EVERS, J. T. C.
Hudson Terrace Apartments (taxpayer) moved for an order to “freeze” the 1978 and 1979 assessments levied by Fort Lee Borough (borough) pursuant to N.J.S.A. 54:2 — 43, commonly known as the Tax Court Freeze Act (the act).[1] Borough claimed the motion was tantamount to a motion for summary judgment and thus, because taxpayer failed to submit a supporting brief as required by R. 4:46-2, sought a dismissal of the motion. The act provides:
*460 Where a judgment final has been rendered by the Tax Court involving real property such judgment shall be conclusive and binding upon the municipal assessor and the taxing district, parties to such proceeding, for the assessment year and for the 2 assessment years succeeding the assessment year covered by the final judgment, except as to changes in the value of the property occurring after the assessment date. Where such changes are alleged, the complaint shall specifically set forth the nature of the changes relied upon as the basis for such appeal. However, the conclusive and binding effect of such judgment shall terminate with the tax year immediately preceding the year in which a program for a complete revaluation of all real property within the district has been put into effect.[2]
It has often been stated that the act was adopted to prevent repeated yearly increases in the assessed valuation of property, unwarranted by changes increasing the value, resulting in harassment of the taxpayer by subjecting him to the trouble and expense of annual appeals to the tax board. Newark v. Fischer, 8 N.J. 191, 84 A.2d 547 (1951); Union Terminal Cold Storage Co. v. Spence, 17 N.J. 162, 110 A.2d 110 (1964); Hasbrouck Heights v. Tax Appeals Division, 41 N.J. 492, 197 A.2d 553 (1964).
The pertinent facts follow. On October 14, 1980 our Supreme Court denied certification 85 N.J. 459, 427 A.2d 559 (1980) of the Appellate Division opinion, 175 N.J.Super. 221, 417 A.2d 1124 (1980), which affirmed a judgment of the Division of Tax Appeals (Division) which found the 1977 value of the property to be below the original assessment. In 1978 and 1979 the assessments were the same as the original 1977 assessment. Cross-appeals were filed with the Division for 1978, which appeals were transferred to the Tax Court. Pursuant to N.J.S.A. 54:2-39, taxpayer filed a complaint directly with the Tax Court for 1979. An answer and counterclaim was filed by borough.
*461 Clearly the judgment of the Division for the 1977 base year became a judgment final on October 14, 1980 when the Supreme Court denied certification. It is undisputed that no revaluation program was effective for 1978 or 1979. Thus it is clear that, in order to “unfreeze” the “freeze,” the borough must prove a change in value of the subject premises during the freeze years.
It has been held that the act is self-executing and must be applied unless either of the two statutory exceptions are present. See Union Terminal Cold Storage Co. v. Spence, supra, and Edgewater v. United States Life Realty Corp., 2 N.J.Tax 421 (Tax Ct. 1981). However, this mandate presumes the existence of a “judgment final” for the base year prior to the assessment date (October 1 of the preceding year) of the freeze year. In such instances the self-executing feature of the act requires an assessment, identical to the base-year judgment amount, be levied for the freeze years. If, in the judgment of the taxing district, the value of the property has changed in a freeze year, the taxing district must then file a complaint. This procedure comports with the language of the statute: “except as to changes in the value of the property occurring after the assessment date.[3] Where such changes are alleged the complaint shall specifically set forth the nature of the changes relied upon as the basis for such appeal.” This procedure also furthers the legislative purpose of the statute by placing the burden of going forward and proving why the freeze should not apply on the taxing district.
However, where there is no “judgment final” prior to the freeze year assessment date, the situation differs. N.J.S.A. 54:4-23 provides, in pertinent part, that the assessor shall “determine the full and fair value of each parcel of real property ... at such price, as in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 [of the pretax year]. . . . ” Thus, without a prior “judgment final” there exists no ceiling on an assessment (except as required by *462 proper valuation practice) for a freeze year. The assessor is required to set the assessment at that value, which in his judgment, the property would have at a bona fide sale on the assessing date.
Here there was no judgment final until well beyond the critical assessing dates and thus there was no assessment limit which the assessor had to recognize. Therefore, pursuant to N.J.S.A. 54:4-23, he maintained the freeze year assessments at the same level of the original assessment in the base year — that value which, in his judgment, it had on all three assessing dates. In this circumstance it was not incumbent upon the borough to file a complaint setting forth the change in value circumstances because, in the judgment of the assessor, there was no change in value. It is the existence of a “judgment final” that triggers the self-executing feature of the act, and without such judgment the assessor is free to, and indeed must, ascribe a value to the property based on his sound judgment.
In Wayne Tp. v. Robbie’s, Inc., 118 N.J.Super. 129, 286 A.2d 725 (App.Div.1972) the 1969 assessment was made prior to the existence of a judgment final for the 1967 and 1968 tax years, which were appealed by the taxpayer.[4] The court held:
Here the municipality did not take any appeal and, of course, no petition of appeal which sets forth the “nature of the changes relied upon for such appeal” was filed. But there was nothing from which it could have appealed. For the tax year 1969 the municipality fixed the original assessment of the land at $107,000 and the county board affirmed. Obviously, the municipality was not “aggrieved” thereby and therefore had no occasion to appeal to the Division. N.J.S.A. 54:2-39. [at 133, 286 A.2d 725]
The essential facts here are virtually identical to Wayne Tp. v. Robbie’s, supra. However, the fact that no “judgment final” existed prior to the freeze years’ assessing dates does not dispose of the question. That fact simply neutralizes the self-executing feature of the act but does not relieve the taxing district of its burden of going forward to prove a change in value. It simply transfers the necessity of taking action in the *463 first instance from the taxing district to the taxpayer. Where, as here and in Robbie’s, no judgment final existed prior to the freeze year assessment, it is for the taxpayer to seek application of the act.[5] Where, however, there is a prior judgment final, the act requires that the assessment remain at the judgment level and further requires that the taxing district file a complaint alleging the basis of the change of value. In both instances it is the taxing district’s burden to prove the change of value in order to avoid the application of the freeze.
Viewed in that light the mere citation of the Freeze Act statute by the taxpayer is sufficient. Having once shown the existence of a judgment final for the base year[6] the entire burden to avoid application of the freeze was placed on the borough. Accordingly, no supporting legal brief was required from taxpayer in the first instance. Borough’s motion to dismiss taxpayer’s motion on that basis is denied.
While a taxing district is not required to file a complaint to avoid the freeze, where a judgment final does not predate the assessment it is still incumbent upon municipality to specifically set forth the nature of the changes in value relied upon in opposing taxpayer’s motion for application. A contrary conclusion would permit a taxing district to avoid the application of the act through the simple expedient of merely alleging such a change. Thus, on the basis of the facts supporting the specific nature of the change to be relied upon as set forth in the taxing district’s supporting papers, the court, in the first instance, must determine whether such facts, if proved, would constitute a change of value within the contemplation of the act.
*464 Borough contends that a change of value can be proved as a result of the effects of the decision in Helmsley v. Borough of Fort Lee, 82 N.J. 128, 411 A.2d 203 (1980), and further, through employing a valuation technique that relies on the value the subject premises would have for conversion (from rental units to condominiums or cooperatives) use.[7]
In July 1975 a trial court held borough’s rent control ordinance, which allowed annual rent increases to a limit of 2.5% to be facially constitutional. However, the court permitted landlords to increase rents beyond the 2.5% limit in accordance with the percentage increases of the Consumer Price Index, on condition that the difference between that percentage and the 2.5% limit be placed in escrow pending a final determination of the controversy. At the outset participating landlords were required to contribute retroactively to November 1974. The facts indicate that this taxpayer landlord chose not to increase the rents beyond the 2.5% limit and thus it did not contribute to the fund.
On October 17, 1978 the court in Helmsley v. Fort Lee, supra, found the 2.5% rent control ordinance confiscatory. The United States Supreme Court declined jurisdiction on April 2, 1979. The trial court’s orders for distribution of the fund produced subsequent appeals, and in March 1979 our Supreme Court took jurisdiction. On January 22, 1980, in Helmsley v. Fort Lee, 82 N.J. 128, 411 A.2d 203 (1980), at which time the escrow fund exceeded $5,300,000, the court held that the 1974 rents were conclusively presumed to be correct. To that figure was added the maximum permissible rent increase — 2.5% from November 6, 1974 to December 31, 1976; Consumer Price Index increases *465 calculated from January 1, 1977 to May 2, 1979; and allowable tax surcharges. Effective May 2, 1979 an ordinance [8] replaced the original rent control ordinance and allowed a pass-through (to the tenants) of actual increases in expenses to a limit of 5%-6.5% depending upon who pays the utility costs.
It is on the basis of this fund, accumulated over several years, and the consequent increase in income and decrease in expenses, that borough relies in arguing change in value. These factors, in utilizing the capitalization of income approach to value, would, according to borough, effect changes in the effective income which would give rise to a substantial change in value.
Taxpayer argues that even if Helmsley effected a change in value, such change would not be sufficiently substantial so as to avoid the application of the freeze. However, it primarily argued that the results of Helmsley were not known, could not have been reasonably foreseen and were but sheer speculation as of the assessing dates of the freeze years. Thus, argues the taxpayer, any such changes in value could not have been considered by the assessor when making the assessments. In analyzing this argument it must be noted that the decision of our Supreme Court, in which the rent levelling ordinance was declared confiscatory, was not rendered until October 17, 1978, some 17 days following the second freeze year assessment and 1 year and 17 days after the assessment date for the first freeze year. It is further noted that the final method of distribution of the escrow fund and the base to which the MAP pass-through plan related were not finalized until January 22, 1980, well beyond the freeze year assessment dates.
In support of its argument taxpayer refers to New Brunswick v. Tax Appeals Division, 39 N.J. 537, 189 A.2d 702 (1963), where *466 the Chief Justice, in rejecting evidence relating to economic rentals subsequent to the assessing date, held (at 545, 189 A.2d 702), that a valuation, although based upon a forecast of earnings, must be found upon what is known and anticipated as of the assessing date unaided by hindsight. Although, in certain instances, this rule has been relaxed to permit consideration of subsequent events, such evidence is admissible only if it is corroborative of or consistent with facts which are known or reasonably foreseeable as of the assessment date. Lamm Associates v. West Caldwell, 1 N.J.Tax 373, 385 (Tax Ct. 1980).
Applying the foregoing principle to this issue it is clear that, as of October 1, 1977 and October 1, 1978 (the freeze years’, assessing dates), the rent control ordinance had been held “facially constitutional.” While landlords, who chose to do so, could increase rents beyond the 2.5% limit, the amount of increase did not represent income “in hand” because the difference between the rent ordinance limit of 2.5% and the then court-imposed limit (CPI percentage increase) had to be paid into an escrow account. When and if the rent increase would ever accrue to the benefit of the landlords was in doubt until October 17, 1978, when the Supreme Court declared the rent control ordinance limit confiscatory. Yet, even as of that date, the landlords did not reap the benefit of the Supreme Court edict for it was only in January 1980 that the Supreme Court finalized the escrow pay-out formula.
The fact that this taxpayer chose not to participate in the escrow fund plan is irrelevant to the court’s determination. If, in fact, the conditional rent increase plan did enhance the income of similarly situated landlords, the lack of participation in the rent increase-escrow plan by this taxpayer which, as to it, produced a lower rental income, would afford it no comfort in attempting to establish a lower value based on the capitalization-of-income valuation technique. There is no doubt that economic rents or fair market rental, if it differs from actual (or lease) rent, must control. New Brunswick v. Tax Appeals *467 Division, supra, 39 N.J. at 544, 189 A.2d 702. Park View Ass’n v. Collingswood, 62 N.J. 21, 29, 297 A.2d 842 (1972). Thus, the higher rent that the subject apartment could have attracted (if taxpayer had elected to increase the rents to the permissible level) controls. Notwithstanding this fact, however, the court finds that, in these circumstances, borough cannot avoid the application of the act to the 1978-1979 tax years.
First, the court finds it inconceivable that the borough assessor, on October 1, 1977 and October 1, 1978, could have foreseen or could have predicted or could have reasonably anticipated the decision of the Supreme Court. At that point, at best, the assessor knew that, as to those landlords who sought to levy an increase, the amount of increase was to be held in escrow pending the high court’s final determination. Until that determination was made he could not consider this fund, or any portion thereof, as representative of income to any landlord. That fund was subject to claims of thousands of past and present Fort Lee tenants. Perhaps a different result would obtain if, prior to the assessment dates, the court had determined the invalidity of the rent-limiting ordinance and reserved for later its formula of distribution of the escrow fund. In that posture an assessor, a taxpayer or a hypothetical purchaser could have reasonably anticipated the rental income increase, with only the time of payment being deferred. As such, the determination of the specific amount and of the time of the pay-out would have corroborated the assessor’s predetermination. Such is not the case here where, as taxpayer argues, “It cannot be said that the judgment final of the Supreme Court was corroborative of or consistent with facts known or ascertainable on the assessment dates. To the contrary that decision represented a change in law of a threshold issue; the outcome of which could only be forecast be a seer.” Manifestly, the assessor could not have been expected, as of the assessing dates, to fix the assessable values predicated upon an event, the outcome of which was unknown at the time.
*468 To be considered in the context of this case is the fact that, as previously noted, it was on October 1, 1977 and October 1, 1978 that the assessments were made on the basis of the price which a hypothetical purchaser would pay to a hypothetical seller for the property at a bona fide sale. A bona fide sale, among other matters, presumes that the parties act prudently and knowledgeably. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978), at 23. Given the facts of this case and allowing the borough the benefit of all doubts it simply cannot be said that a prudent, knowledgeable investor on the critical assessing dates would pay a substantially higher price than what all other market indicators would suggest, merely because, depending on a future court decision, the economic rents for similar apartment units may increase. ' The existence of an escrow fund may be said to alleviate the problems of collecting rent increases — should such increases be allowed — but the fact of the fund does not remove the matter from the realm of possibility — from being a mere hope. I do not perceive that a prudent, knowledgeable purchaser would do more than compensate a seller for the latter’s share of the escrow fund on a dollar-for-dollar basis.
The putative enhancement in value alleged by borough, attributable to “conversion value” of the subject property into condominiums or cooperatives, according to the borough, was a phenomenon which began in Fort Lee as early as 1973, or some four to five years prior to the assessment dates. This statement was not disputed by taxpayer. Certainly, such being the case, this value was, or should have been, considered by the assessor on October 1, 1976 in making the 1977 (base year) assessment, and by the Division in rendering its decision for the 1977 tax year. That the assessor and/or the Division may, or may not, in fact have considered this feature in the valuation proces is not for this court to consider. Clearly, however, the fact of conversions was in existence, was known, and was presumably considered in the valuation process. To assume otherwise and to allow borough to attempt to avoid the freeze on this basis would contra *469 vene some very basic precepts which are paramount in the field of taxation. To now permit the introduction of testimony on this basis would violate the very basic principle of stability in assessments.
In prohibiting the introduction of testimony regarding valuation for conversion purposes the court is constrained to note that such prohibition is confined only to the facts of the instant matter. This finding is not to be construed as a prohibition against introduction of evidence to the effect that value for conversion purposes would, or would not, be a proper consideration in a non-Freeze Act valuation case. Not to be overlooked is the fact that this decision is based on a Freeze Act motion which is based on uncontroverted facts.
In arriving at this conclusion the court is further constrained to observe that its decision is in keeping with the obvious legislative purpose of the act which was intended to prevent the harassment of taxpayers. A contrary decision would do violence to that purpose in that it would permit assessors to assess on the basis of mere probabilities and/or possibilities. Stability of assessments would be at the mercy of a taxing district’s inventiveness and imagination. Such considerations would be contrary to the happenings in the real world of the market place and would produce innumerable appeals from mystified taxpayers. It was to correct and discourage such situations that the Freeze Act was enacted in the first instance.
Taxpayer’s motion is granted. Accordingly the Clerk of the Tax Court is directed to enter judgment pursuant to NJ.S.A. 54:2-43 fixing the 1978 and 1979 assessments at the level of the 1977 Division of Tax Appeals judgment as follows:
Land $1,470,600
Improvements 1,812,240
Total $3,282,840

Taxpayer’s pending 1980 complaint is not included in this motion.

“Judgment final,” as used in the statute, is not to be equated with “final judgment.” As employed in the act, a final judgment becomes a judgment final when the period of appeal therefrom has terminated. Its county tax board counterpart, N.J.S.A. 54:3-26, employs the language “where no request for review is taken to the Tax Court,” which language indicates that a county board judgment becomes a “judgment final” when the 45-day appeal period as provided in N.J.S.A. 54:2-39 has expired. Notwithstanding the different terminology, it is clear that neither Freeze Act can apply until the appeal period from the judgment has expired.

 October 1 of the year preceding the base year.

Not readily apparent from the opinion was the fact that the judgment on the 1967-1968 appeals was entered April 7, 1969.

Where an action is pending, application of the act is sought by motion. Where no complaint is pending, the action is initiated through an application in aid of litigant’s rights.

Taxpayer’s (unrefuted) certification, among other things, traced the history of the 1977 litigation and clearly demonstrated that, upon denial of the petition for certification by the Supreme Court, the judgment became final.

Borough’s certification and brief initially relied only on the Helmsley v. Fort Lee decision. The conversion value argument was introduced for the first time at oral argument. Taxpayer, while initially objecting to any reference to conversion value, nevertheless responded to such argument at oral argument and in its supplemental brief. The overriding public interests which are involved in this and many other similar Fort Lee matters, together with taxpayer’s waiver of its initial objection, led the court to consider such argument.

 Ordinance 76-8, known as MAP, had been previously adopted but, by its terms, became effective 30 days after the United States Supreme Court declined jurisdiction.