846 A.2d 653 (2004)
368 N.J. Super. 416
THE MEADOWS FOUNDATION, INC. Plaintiff-Respondent,
v.
Thomas WILLIAMSON and Kathleen Williamson, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued March 30, 2004.
Decided April 30, 2004.
*654 Thomas Williamson argued the cause for appellant.
A.F. McGimpsey, Jr., Somerset, argued the cause for respondent (McGimpsey & Caffery, attorneys; Mr. McGimpsey, on the brief).
Before Judges A.A. RODRÍGUEZ[1], PAYNE and LANDAU.
The opinion of the court was delivered by
LANDAU, J.A.D., (retired and temporarily assigned on recall).
This is an appeal from a final Judgment of Possession entered by the Law Division, Special Civil Part, Somerset County, in favor of plaintiff, The Meadows Foundation, Inc. and against defendants, Thomas Williamson and Kathleen Williamson.
In 1995, The Meadows Foundation, Inc., (Foundation), a non-profit entity, entered into a "Sublease Agreement" effective for a one-year term beginning on January 1, 1996, with the two defendants, Kathleen Bennett (now Williamson) and Thomas Williamson, each of whom separately signed as a tenant, but were together referred to as "tenant" in the agreement. The agreement provided for possession and use of an apartment in the "Hageman Farmhouse," part of a group of historic structures leased by Franklin Township to the Foundation. It delineated the rooms reserved for their exclusive use and shared *655 use, and set forth defendants' special responsibilities as "Resident Caretaker." Those responsibilities included housekeeping and maintenance of the entire Farmhouse and grounds, and "keeping the walks and driveway free of debris, garbage, snow or ice." It was also required that "the condition and appearance of the kitchen and first floor should be one of order and cleanliness, at all times, to represent the property well in the event that a prospective renter inspects the facility prior to rental for an event."
Defendants' rent was fixed at $550 per month. The lease stated that its provisions were to survive expiration of the one-year term, pending preparation of a new lease. No further leases were executed.
The Foundation provides stewardship for public use and visitation at the historic Hageman site, and undertakes its upkeep and preservation as well as efforts to secure rehabilitation funding. Rentals of the site for weddings and other private functions provide a source for operational funds, together with the modest rent paid by the caretaker/tenants. The 1-1/2 acre tract of land upon which the buildings are located is owned by the State of New Jersey and is leased to the Township.[2]
It is of some interest that, in 1985, another sub-lease was entered into between Thomas Williamson and the Foundation. It provided much less residence space than the 1996 lease, and was made subject to the requirement that he share in "regular and normal maintenance of the house and grounds" with the Foundation. Yearly rental was fixed at $3,000.
The Williamsons were married after execution of the 1996 lease. Each had been a long standing member of the Foundation's Board and was active in its efforts at the historic Hageman Farm.
In time, the Board and its Property Committee were constrained to express dissatisfaction with the extent, method, and use by defendants of extensive non-leased space in the Farmhouse attic and basement, and in the carriage house, for personal storage of household goods. The goods appear to have been the contents of Ms. Williamson's former home, stored by her following an earlier divorce. Serious concerns were also expressed about cleanliness of the leased apartment, the grounds and outbuildings, and about conditions negatively affecting the attractiveness for public use and private rental of the property that arose by reason of the large number of pets kept by defendants on the grounds and in the house. Other housekeeping and maintenance inadequacies were brought to defendants' attention.
Although defendants were initially able to forestall removal by exercise of their two votes on the Board, concerns about their conflict of interest prompted by-law changes. They elected to resign from the Board in order to remain in the house as caretakers. However, after expiration of a designated period to cure, defendants were discharged as caretakers, and given a Notice to Quit and Demand for Possession on October 9, 2002. Possession was demanded effective January 31, 2003. When defendants declined to leave, the present action was initiated.
The bench trial of plaintiff's action primarily focused upon whether its demand for possession should be granted in light of the statutory exceptions to the broad protection generally afforded to residential *656 lessees by the Anti Eviction Act, N.J.S.A. 2A:18-61.1 to -61.12. Those exceptions include: (1) N.J.S.A. 2A:18-61.1e(1), which provides that "the person has continued, after written notice to cease, to substantially violate or breach any of the covenants or agreements contained in the lease for the premises where a right of re-entry is reserved to the landlord in the lease for a violation of such covenant or agreement"; and (2) N.J.S.A. 2A:18-61.1(m), which states that "the landlord or owner conditioned the tenancy upon and in consideration for the tenant's employment by the landlord or owner as superintendent, janitor or in some other capacity and such employment is being terminated."
Although the proofs implicated both exceptions, the tenor of the trial was largely directed to the defendants' status under sub-paragraph (m) quoted above.
Relying principally upon the prior 1985 lease between the Foundation and himself, Mr. Williamson, an attorney, argued that there was no "employment" under sub-paragraph (m). He also urged that any maintenance duties set forth in that lease were merely consistent with those imposed upon an apartment tenant in conventional leases; and that the imposition of caretaker responsibilities more specifically set forth in the subsequent lease executed by Kathleen Bennett and himself in 1995 was not simultaneous with inception of his earlier tenancy. Thus, defendants argued that under applicable case law, the subsequent lease was insufficient to end their tenancy as distinct from their caretaker status. It was further urged that, by accepting rental for two of the months that defendants continued to occupy the premises after the date designated in the Notice to Quit, the Foundation had waived any basis for its demand for possession.
Those arguments were echoed on appeal.
Upon consideration of the record, we believe that the judgment of the trial court was based on findings of fact which are adequately supported by the evidence. (R. 2:11-3(e)(1)(A)), and so affirm, substantially for the reasons set forth by Judge Kumpf in his written opinion dated June 27, 2003.
While sufficient reason to affirm exists based upon the trial judge's resolution of the issues the parties elected to join and argue, we add these comments.
As observed in Korona, Landlord and Tenant Law, Volume 23A, N.J. Practice Series, Section 43.11:
The Anti-Eviction Act's applicability is limited to leases whose purpose is fundamentally and primarily residential in nature and excludes leases which serve to a substantial degree non-residential purposes.
Whether or not deemed an "employment" for purposes of sub-paragraph (m), a question which we revisit briefly below, there can be no question on the present record that the purpose of this tenancy was primarily to ensure a caretaker presence as well as performance of maintenance functions at the Hageman historic site.
As we noted in Starns v. American Baptist Estates, 352 N.J.Super. 327, 333, 800 A.2d 182 (App.Div.2002):
The Anti-Eviction Act does not define the terms "residence" or "residential use." The Act itself applies only to residential tenants. An examination of the scope of the Anti-Eviction Act's protections provides some assistance in interpreting the terms "residence" and "residential use" as used in section 61.1(h). Occupancy of a dwelling unit does not make the occupant a residential tenant under the protection of the Anti-Eviction *657 Act. For example, the occupant of a dwelling unit on a farm is not a residential tenant and protected by the Anti-Eviction Act when the occupant has leased the fields and farm structures as well as the farmhouse. Harden v. Pritzert, 178 N.J.Super., 237, 241-42, 428 A.2d 927 (App.Div.1981). Similarly, a hospital which leased apartments at a nearby apartment building for use by some of its medical personnel was not protected by the Anti Eviction Act. We reasoned that "the purpose of the hospital's tenancy here is at best an institutional and residential hybrid neither envisioned nor addressed by the act." Morristown Mem. Hosp. v. Wokem Mortgage & Realty Co., 192 N.J.Super. 182, 186, 469 A.2d 515 (App.Div.1983).
We also made it clear that, "cases and the legislative history suggest that the character of the entire premises in which the dwelling unit is located must be considered" in determining applicability of the Anti Eviction Act. Starns, 352 N.J.Super., at 334, 800 A.2d 182. Much like the Morristown Mem'l Hosp. case cited in Starns, from the perspective of the tenant/sub-lessor in this matter, the residential aspect of defendants' sub-lease is not an end in itself but is, rather, incidental to and a means of serving the Foundation's larger and underlying institutional goals and objectives. See Morristown Mem'l Hosp. v. Wokem Mortgage & Realty, 192 N.J.Super. 182, 185, 469 A.2d 515 (App.Div.1983).
The Foundation is not the classic residential landlord or apartment sub-lessor seeking greater investment returns through tenant replacement or higher rents. It has moral and fiduciary obligations that arise because it has been leased a historic government owned property for the purpose of facilitating public appreciation, utilization and enjoyment of that property.
Defendants' sub-tenancy arose because plaintiff's stewardship of the Hageman Farm required that it address vandalism problems by arranging for a resident caretaker, and that it provide for maintenance necessary to accommodate its use as a public attraction. Were defendants to prevail in this matter, they would receive, at a below-market rent, "a perpetual tenancy, virtually a life interest." See J.M.J. New Jersey Properties, Inc. v. Khuzam, 365 N.J.Super. 325, 332, 839 A.2d 102 (App.Div.2004)(citing Starns, supra, 352 N.J.Super. at 331, 800 A.2d 182, and Center Ave. Realty, Inc. v. Smith, 264 N.J.Super. 344, 350, 624 A.2d 996 (App.Div.1993)). Moreover, although their caretaker-maintenance duties were terminated, there would be no place to house the necessary resident caretaker and maintenance replacement, whose duties call for a presence on the grounds.
Rather than serving the interests of the public, the Hageman House would thus be substantially dedicated to serving defendants own personal interests.
Manifestly, the hybrid tenancy that we consider today is not one intended by the Legislature for protection under the Anti-Eviction Act. Indeed, were it necessary to reach the issue, we doubt that enforcement of the Act in a case such as this could survive constitutional scrutiny, both by reason of the absence of sufficient public necessity to warrant interference with a landlord's common law rights, and because it would have the effect of compelling donation of the use of public property to private parties without sufficient offsetting consideration.
Finally, as our affirmance has substantially adopted Judge Kumpf's opinion, we comment additionally on several of the issues addressed by appellants to the applicability of N.J.S.A. 2A:18-61.1(m).
*658 The record makes clear that, to the extent required under Kearny Court Associates v. Spence, 262 N.J.Super. 241, 245-246, 620 A.2d 1056 (App.Div.1993); Village Associates v. Perez, 253 N.J.Super. 507, 510, 602 A.2d 304 (L.Div.1991); and Cruz v. Reatique, 212 N.J.Super. 195, 199, 514 A.2d 549 (L.Div.1986), both the 1985 and 1996 tenancies were created only because the provision of living space was part of the consideration for caretaking and maintenance services necessitating on-grounds residence. Neither rental tenancy preceded the "employment" relationship. Moreover, the 1985 and 1996 leases were not congruent, either as to parties or as to the premises demised. Each lease contemplated the performance of maintenance duties on the entire historic site, not limited to the rooms leased. However, more space was leased to defendants in the 1996 agreement than was leased to Thomas Williamson in 1985. The 1996 lease governs this matter, but even were the 1985 lease properly deemed to be a factor, its terms, and the parties' subsequent conduct, clearly contemplated service beyond those ordinary duties a residential tenant owes to a landlord under the standard apartment lease introduced by defendants.
To the extent that appellants challenge the existence of an "employment" under sub-paragraph (m), by raising issues relating to workers' compensation, unemployment insurance, and federal and state taxation, we note that the latter issues are not before us. There may well be a question whether the difference between market value of the sub-lease and the actual rent charged should be quantified for taxation or other purposes.
We think it clear, however, that the word "employment" as used in sub-paragraph (m) is broad enough to contemplate the services of an independent contractor whose tenancy is incidental to the employment of his or her services. We are mindful, further, that one may "employ" the services of a plumber or electrician or gardener and, indeed, of persons providing services in some other capacity without necessarily creating the peculiar kind of "employment" which defendants urge is necessary under sub-paragraph (m). We are satisfied that the caretaker and maintenance services required of these defendants fulfill the legislative intention captured in the words "or in some other capacity" used in that sub-paragraph.
On the issue of waiver raised by defendants, we agree with the trial judge's recognition of case law making clear that, standing alone, acceptance of rent does not constitute a waiver, although it may be evidence of a waiver. We add, however, that this case does not involve a landowner who seeks possession by reason of the non-payment of rent. It would be a strange doctrine of law that would require a landlord with a legitimate basis for demanding possession, facing a tenant who contumaciously remains in residence, to have to forego the receipt of compensation for occupancy after the final quit-date.
For the reasons expressed above, the Order for Judgment of Possession is affirmed.
NOTES
[1] Judge Rodríguez did not participate in the argument of this case. He has been added with consent of all counsel.
[2] The record does not indicate whether the State lease is pursuant to N.J.S.A. 28:1-5 and 1-6. We take notice, however, of the Legislature's recognition of the State's interest in preservation and maintenance of historic sites expressed in Title 28 and in the Municipal Land Use Law at N.J.S.A. 40:55D-2j.